# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

REGINALD COLE JR.,

        Plaintiff,

        v.                          Case No. 08-CV-695

TRAVIS CAUL, BELINDA SCHRUBBE,
MARY GORSKE, RALPH FROELICH,
JOSEPH BEAHM, NURSE GAYLE,
DR. SHUTTLE, DR. SUMMITCH,
and COREY MUELLER,

        Defendants.

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. #38),
GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. #41),
DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. #67),
DENYING AS MOOT PLAINTIFF'S MOTION TO APPOINT COUNSEL (DOC. #80),
AND DISMISSING PLAINTIFF'S CLAIMS AND THIS ACTION**

The pro se plaintiff, a Wisconsin state prisoner, is proceeding on Eighth Amendment claims regarding his conditions of confinement and deliberate indifference to his serious medical needs. This matter is before the court on the parties' cross motions for summary judgment.

## I. STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that, under the applicable substantive

law, "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In a § 1983 case, plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and must come forth with sufficient evidence to create genuine issue of material fact to avoid summary judgment. *McAllister v. Price*, — F.3d —, 2010 WL 3169326, *3 (7th Cir. 2010) (citing *Johnson v. Snyder*, 444 F.3d 579, 583 (7th Cir. 2006)); *see also Celotex*, 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings . . . ."); Fed. R. Civ. P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial."). "Rule 56(c) mandates the entry of summary judgment . . . upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

That both parties move for summary judgment does not establish that a trial is unnecessary or empower the court to enter judgment as it sees fit. *See* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2720 at 327-28 (3d ed. 1998). The court may grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law on the basis of the material facts not in dispute. *See Mitchell v. McCarty*, 239 F.2d 721, 723 (7th Cir. 1957).

## II. FACTS[1]

Plaintiff was incarcerated at Waupun Correctional Institution (WCI) at all times relevant. Defendants are: Officers Travis Caul, Joseph Beahm, and Corey Mueller; Heath Services Manager/ Nurse Belinda Schrubbe; Nurses Mary Gorske and Gail Waltz; Dr. Ralph Froelich, psychiatrist; Dr. John Schettle, dentist; and Dr. Paul Sumnicht.

On December 26, 2007, Officer Caul passed breakfasts trays to inmates, including plaintiff, housed in the Health and Segregation Complex. According to plaintiff, he opened his milk, tasted it, and then observed that it was contaminated with "bloody snotty spit." Plaintiff avers he told Caul about his milk and showed it to him. According to defendants, Caul did not deliver contaminated milk to plaintiff, nor did plaintiff complain of having contaminated milk.

Plaintiff avers that after consuming the milk, he began having numerous health issues such as migraines, swollen tonsils, sore throat, chest cramps, constipation, throwing up blood, and stomach pains. Between January and December 2008, plaintiff submitted more than 90 Health Service Requests forms, and he received responses to

---

[1] This Facts section is taken from Defendants' Proposed Findings of Fact and Plaintiff's Proposed Findings of Fact. Facts are undisputed unless otherwise indicated. Proposed facts that do not comply with the Federal Rules of Civil Procedure are not included in this section. *See* Fed. R. Civ. P. 56(e)(1) (supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated).

In support of his motion for summary judgment, plaintiff filed a combined supporting brief and proposed findings of fact (Docket #38). Plaintiff's proposed facts cite to his Exhibits document (Docket #39), which consists of Exhibits 1-355. These "exhibits" include discovery responses from the defendants, Wisconsin Department of Corrections Inmate Complaint Review System documents, affidavits, and Department of Corrections medical records related to the plaintiff. Defendants filed a response to plaintiff's proposed findings of fact (Docket #60), in compliance with Civil Local Rule 56 (E.D. Wis.).

In support of their motion for summary judgment, defendants filed several affidavits, as well as properly authenticated copies of Inmate Complaint Review System offender complaints filed by plaintiff that are referenced in this section. (*See* Affidavit of Theresa Murphy, Ex. 1001.) Defendants also filed properly authenticated medical records maintained in the Health Services Unit at Waupun Correctional Institution related to plaintiff. (*See* Affidavit of Belinda Schrubbe, Ex. 1000.)

each one of his requests from Health Services Unit ("HSU") staff.  A description of some of plaintiff's contact with HSU staff follows.

## A. HEALTH SERVICES

On February 4, 2008, plaintiff complained he was vomiting blood and Nurse Gorske saw him on an emergency basis.  Plaintiff told her he had been sick since finding blood in his milk on December 26, 2007, and that he refused to eat breakfast and lunch meals.  Based on plaintiff's complaints, Gorske ordered to hold his Excedrin medication because it can cause ulcers and increase bleeding.  She ordered laboratory testing, a complete blood count with differential, a complete urinalysis, and an HIV test.  Gorske also ordered meal monitoring based on plaintiff's refusal to eat certain meals.

The results of the laboratory testing showed a near normal blood count and slightly low white blood cells.  The urine test showed plaintiff was eating less than his body required to maintain, which probably also reflected in the small amount of protein in the urine.  Other tests showed normal glucose (blood sugar) and normal liver and kidney tests.

On February 5, 2008, nursing staff saw plaintiff for a hunger strike assessment and advised him of reactions that his body could undergo if he did not eat properly, including loss of body fluids, dizziness, weakness, nausea, tiredness, low blood sugar, slow heart rate, low blood pressure, and weight loss.  From February 2, 2008 through May 27, 2008, staff monitoring plaintiff's acceptance of meals indicated he typically refused morning and noon meals, but accepted and ate his evening meal.  Meal monitoring ended in May 2008 because plaintiff was eating at least 50 percent of his meals.

On February 24, 2008, plaintiff filed a health services request stating he collapsed on his right knee after standing for almost twenty minutes, and requesting

4

crutches to shower and attend recreation. Nurse Schrubbe denied his request, finding crutches were not medically necessary and that he could wash up and work out in his cell.

Nurse Gorske next saw plaintiff on February 25, 2008, based on his gastrointestinal complaints. Her examination revealed stable vital signs but hypoactive bowel sounds, indicating a slowing of intestinal activity, and she noted plaintiff lost three and a half pounds in the previous two weeks. Gorske could find no medical cause for the weight loss, and she encouraged plaintiff to follow up with clinical services. On March 13, 2008, Nurse Schrubbe advised plaintiff he could experience cramping and discomfort if he did not begin to eat properly and she also advised he would be scheduled for a medical appointment, if requested.

Plaintiff was placed in clinical observation status on March 22, 2008, because he was at risk of harming himself. On March 24, 2008, Nurse Waltz saw plaintiff, he complained his stomach hurt, and she noted he was to be seen by the WCI physician that day. Dr. Sumnicht evaluated plaintiff that day for persistent complaints of chest and abdomen pain. The physical exam findings showed plaintiff's bowels were normal, his weight was appropriate, and the scratches on his skin were healing well, a sign of good health. Dr. Sumnicht ordered tests to evaluate stomach pain, medication to treat constipation and heartburn on a trial basis, and a follow up visit for back pain evaluation. All vital signs were found to be normal.

On March 26, 2008, Dr. Sumnicht diagnosed plaintiff with mild mononucleosis, based on his review of a laboratory test indicating a low white blood cell count and another test showing mononucleosis antibodies in plaintiff's blood. Dr. Sumnicht assessed plaintiff had a chronic mononucleosis infection causing his nausea and he should

be notified to discuss treatment options and educated about the long clinical course that mononucleosis often has.[2]  A declining dose of steroid medication was prescribed.

On April 8, 2008, plaintiff complained he could barely walk and requested a wheelchair.  Nurse Schrubbe reviewed plaintiff's progress notes and physician orders from March and April 2008, which revealed he had been seen by HSU nursing staff fourteen times and was evaluated by his primary care physician on March 4, 24, 26 and on April 25, 2008.  None of the health care professionals who examined plaintiff indicated any objective medical reason he had difficulty walking or standing and Schrubbe therefore determined a wheelchair was not medically necessary.

Dr. Sumnicht saw plaintiff on April 25, 2008, based on his complaints of chest pain, right calf pain, migraine, left low back, sore throat, and constipation.  He ordered Metamucil for constipation and scheduled a follow-up visit for plaintiff's limp.  He did not give plaintiff pain medications because he did not find signs of medical problems that needed to be treated with pain medications.  On May 12, 2008, Dr. Sumnicht saw plaintiff related to his complaints of heel pain.  The physical examination was normal and Dr. Sumnicht's assessed somatic complaints (emotionally magnified small body pains).  He treated plaintiff by reassuring him of the normal findings, and discussing somatic complaints and self pity.

Nurse Waltz saw plaintiff on June 30, 2008, who had been placed in the segregation unit after a cell extraction, which required staff to use chemicals.  Plaintiff

---

[2] Mononucleosis is an infection caused by a virus.  The mononucleosis virus can be found in saliva and mucus, which is why it is most typically called the "kissing disease," but the mononucleosis virus can also be spread through exposure to a cough, sneeze, or through sharing food utensils.  Signs and symptoms of the mononucleosis virus usually develop four to six weeks after exposure to the virus, but can come on slower.

complained of chest discomfort and difficulty breathing. He became agitated and did not cooperate with completing the examination. Nurse Waltz advised him to continue washing irritated skin and eyes. On July 10, 2008, Nurse Waltz saw plaintiff, who complained his hand hurt from hitting it against the wall, ongoing chest cramping, and migraines. The examination revealed no difficulty breathing, clear lungs, no nausea, no blurred vision, no diaphroese, slight swelling of the middle knuckle, but adequate range of motion in the entire right hand.

On September 29, 2008, Dr. Sumnicht saw plaintiff related to his complaints regarding migraines and prescribed a medication on a therapeutic trial basis. He planned to follow up to determine whether the medication decreased the severity or frequency of the headaches and if it did, plaintiff would be diagnosed as suffering from migraines.

Dr. Sumnicht saw plaintiff on November 10, 2008 for an evaluation related to his complaints of "chest cramping" and migraine follow up. He was notified plaintiff had been strapped down two weeks prior to this visit, and untaken migraine prevention medication was found in his cell. The examination was normal. Dr. Sumnicht reassured plaintiff he was in good health, and instructed him in stretches to control any stiffness. On December 29, 2008, Dr. Sumnicht saw plaintiff who complained of left lower back aches and vomiting. Dr. Sumnicht found that the plaintiff had not lost any weight and did not need extra food. Plaintiff's back had a little stiffness and Dr. Sumnicht ordered a night time muscle relaxer and a Vitamin D level. Plaintiff was instructed to continue the Tylenol and muscle rub.

**B. CLINICAL SERVICES**

When Dr. Froelich saw plaintiff on February 8, 2007, plaintiff indicated he feared the staff poisoning him, and he was seeing ghosts and hearing voices. Although Dr. Froelich noted possible malingering psychosis, he prescribed Risperidone (antipsychotic drug) 1 mg., twice a day. Dr. Froelich saw plaintiff on March 20, 2008, and he stated he was hearing voices and not sleeping. Dr. Froelich changed the prescription of Risperidone to 2mg at nighttime.

On April 1, 2008, plaintiff smeared feces over the cell walls, windows, and door. At a meeting with Dr. Froelich on April 3, 2008, plaintiff requested to be moved to a psychiatric treatment facility because he felt he was getting worse. Dr. Froelich determined his hallucinations could be a way of claiming to have a mental illness so he would be transferred to a psychiatric facility. He opined the Risperidone was not helping plaintiff, so he discontinued that medication. He did not feel plaintiff would benefit from any other anti-psychotic medications because he saw no indication plaintiff was hearing voices. Dr. Froelich's diagnosis included malingering psychosis. Malingering is intentional production of false or exaggerated symptoms motivated by external incentives, such as obtaining compensation or drugs, avoiding work or military duty, or evading criminal prosecution. Plaintiff's reports of psychotic symptoms were inconsistent with his presentation and were variable.

On May 1, 2008, Dr. Froelich noted plaintiff's behavior to be manipulative and self-defeating, especially related to his taking meals, because he demanded more food and then claimed to vomit. He also continued to indicate he wanted to be transferred to another institution due to a severe mental illness. Plaintiff agreed to receive treatment for anxiety, and Dr. Froelich prescribed Trazodone (antidepressant). Plaintiff appeared alert, oriented,

and cooperative at a June 5, 2008 meeting with Dr. Froelich.  Plaintiff reported there were still times when he saw ghosts or heard his brother talking to him, but he did not seem to be responding to internal stimuli.  Dr. Froelich renewed the Trazodone and ordered a snack bag to be taken with the medication.  On July 10, 2008, Dr. Froelich saw plaintiff, who appeared alert, oriented and cooperative.  His speech was coherent, rational and goal-directed without any evidence of a thought disorder.  Dr. Froelich renewed the Trazodone and snack bag.  At an August 21, 2008 meeting with Dr. Froelich, plaintiff presented as agitated and talkative, he related that he was sleeping fairly well, and had no medical complaints. Dr. Froelich increased the Trazodone for anxiety relief.  On September 11, 2008, plaintiff was alert, oriented, and talkative but would not engage in any meaningful discussion about his treatment.  Dr. Froelich informed plaintiff he would keep him at his present Trazodone dosage.  Plaintiff reported voices in a way that indicated he was probably not under the influence from hallucinatory experiences.

On October 2, 2008, Dr. Froelich went to plaintiff's cell and found him lying on his cot covered up with a blanket.  He refused to discuss his treatment. In order to continue the Trazodone, it was necessary for plaintiff to discuss medication side effects, beneficial effects, and without his cooperation it would not be prescribed.   Plaintiff continued to refuse to talk to Dr. Froelich, and he discontinued the Trazodone.  Dr. Froelich met with plaintiff on November 13, 2008, who was alert and seemed oriented.  His speech was coherent, although somewhat rambling and repetitive, and he reported no psychotic symptoms.  No psychiatric medications were ordered and Dr. Froelich advised plaintiff he would be seen for follow up if he requested clinical services.

**C. DENTAL SERVICES**

WCI inmates request dental services by completing a Dental Service Request (DSR). Dental services and appointments are scheduled by triaging and scheduling patients based on clinical determinations of pain and priority status. Dr. Schettle reviews, triages, and prioritizes DSRs into priority, essential, routine, and other subcategories. A DSR indicating a dental emergency is given higher priority than non-emergency DSRs. A dental emergency is a dental problem causing a life threatening condition and requiring immediate care, such as uncontrolled bleeding, allergic reaction, swelling or fractures causing impaired breathing, high fever from dental infection, or serious trauma. The severity of pain may also affect the prioritization of providing dental services. If an inmate indicates he is in pain, Dr. Schettle treats the request as a priority matter unless he determines through record review that the matter is not urgent.

On March 28, 2008, plaintiff filed a DSR stating that he had a ". . . hole in my tooth [be]cause I bit a piece of metal and it chip[ped] my tooth. . . ." (Schettle Aff. ¶ 13; Schrubbe Aff., Ex. 1000 at 220.) Dr. Schettle told plaintiff he would be scheduled for a priority appointment. On April 4, 2008, Dr. Schettle examined plaintiff and advised him of the "poor pulpal prognosis" for teeth #18 and #19 due to deep cavities. (Schettle Aff. ¶ 14.) He restored teeth #18 and #19 with glass filling material. It was Dr. Schettle's opinion that the decay of teeth #18 and #19 was due to cavities, not biting into metal. Dr. Schettle visited plaintiff on April 10 and 18, 2008, and plaintiff reported his recently restored teeth were much better and he was not having pain or discomfort.

On May 4, 2008, plaintiff filed a DSR complaining of bleeding and pain in his back teeth. Dr. Schettle responded the following day and advised plaintiff he would be placed on the routine wait list for an appointment. He placed plaintiff on the routine list

because he interpreted plaintiff's complaint as bleeding from poor oral hygiene and sensitivity consistent with placement of the fillings, which would gradually improve on its own. Plaintiff continued to have dental complaints and he filed DSRs on May 9 and May 23, 2008. Dr. Schettle responded to the DSRs and advised plaintiff he was on the essential wait list for an appointment. Dr. Schettle placed plaintiff on the essential wait list instead of the priority wait list based on his review of the dental and medical charts and because the dental problems described in the DSR were not consistent with the documentation in the dental and medical records. On June 5, 2008, Dr. Schettle examined plaintiff related to complaints of tooth pain and diagnosed him with pericoronitis (infection of tissue surrounding the tooth) related to the tooth #17. He prescribed an antibiotic and pain medication.

The restorations related to teeth #18 and #19 were slightly adjusted on June 12, 2008. It is not uncommon for the type of dental restorations placed in plaintiff's mouth to require adjustments and the restorations were slightly reduced to lessen contact with other teeth. The restorations were intact and functional following the adjustment and pain medications were not prescribed because posttreatment discomfort was not anticipated.

On July 7, 2008, plaintiff filed a DSR complaining of severe and constant dental pain, and Dr. Schettle advised him the following day he would be seen for a priority appointment. Dr. Schettle attempted to see plaintiff on August 1, 2008, but plaintiff refused to be seen for dental services.

Plaintiff filed a DSR on September 24, 2008 and two days later Dr. Schettle examined him. Plaintiff complained of pain related to tooth #17. Dr. Schettle recommended extraction of the tooth and prescribed Penicillin (antibiotic) and Ibuprofen for pain. On

October 3, 2008, plaintiff filed a DSR complaining of "severe constant pain." (Schettle Aff. ¶ 27; Schrubbe Aff., Ex. 1000 at 232.) Dr. Schettle scheduled plaintiff for a priority appointment and on October 10, 2008, plaintiff refused dental services.

Dr. Sumnitch prescribed Tylenol starting September 29, 2008, but it was ordered stopped on October 16, 2008, due to plaintiff stockpiling the medications. In October 2008, plaintiff refused to sign "Authorization and Consent to Surgery and Drug Administration," and refused dental treatment. In November and December 2008, Dr. Schettle was aware of plaintiff's complaints related to tooth pain, but could not help him until he signed an authorization for the extraction of the tooth. On February 9, 2009, plaintiff signed the authorization and Dr. Schettle extracted the tooth the same day.

## D. INMATE COMPLAINT REVIEW SYSTEM AND CONDITIONS OF CONFINEMENT

### 1. DOC Complaint File Number WCI-2008-14342

On May 21, 2008, plaintiff filed offender complaint WCI-2008-14342, complaining about the water coming out of his sink. Inmate Complaint Examiner (ICE) Theresa A. Murphy investigated the complaint, and interviewed Mr. Roggentine from Engineering, Maintenance and Construction (EMC) Department. According to Mr. Roggentine, EMC had been working on some of the pipes in the segregation unit around the time of the complaint, so there may have been some extra sediment in the pipes. Roggentine recommended plaintiff run the water a bit longer to flush it out. He also noted the well water at WCI is hard causing a build-up of minerals in the system and some discoloration, but these conditions do not affect water quality or cause health hazards. The water at WCI is tested on a regular basis to comply with Wisconsin Department of Natural

Resources requirements and the Clean Water Act. No unacceptable test results have been received at any time in 2008.

## 2. DOC Complaint File Number WCI-2008-19474

On July 17, 2008, plaintiff filed offender complaint WCI-2008-19474, claiming Officer Beahm threatened to kill him. Ms. Murphy informed plaintiff an investigation into possible staff misconduct would take place and because the investigative process was regulated by state law and collective bargaining agreements, no further information would be given to him. Plaintiff pursued the complaint and provided a detailed written description of the events he claimed happened. Based on plaintiff's statement and the sensitive nature of this incident, Ms. Murphy recommended the complaint be dismissed, with the modification that it be further processed pursuant to the applicable personnel rules and collective bargaining agreements pursuant to DAI Policy 310.00.01. No further action was taken by the ICE Office.

## 3. DOC Complaint File Number WCI-2008-19475

On July 17, 2008, plaintiff filed offender complaint WCI-2008-19475, claiming Officer Beahm threatened to beat him. Ms. Murphy informed plaintiff an investigation into possible staff misconduct would take place. She also informed him that because the investigative process was regulated by state law and collective bargaining agreements, no further information would be given to him. Plaintiff pursued the complaint and provided a detailed written description of the events he claimed happened. Ms. Murphy recommended the complaint be dismissed, with the modification that it be further processed pursuant to the applicable personnel rules and collective bargaining agreements pursuant to DAI Policy 310.00.01. No further action was taken by the ICE office.

**4. DOC Complaint File Number WCI-2008-26822**

Plaintiff filed offender complaint WCI-2008-26822 on October 13, 2008. He claimed Officer Mueller told him, "[I] don't like black guys, that's why." (Mueller Aff. ¶ 6.) Mueller denies making this statement. Ms. Murphy investigated the complaint, found the allegations to be of concern, and recommended the complaint be dismissed with the modification that a copy be forwarded to the Security Director and HSC Supervisors for informational purposes and possible follow up if deemed necessary.

**5. DOC Complaint File Number WCI-2008-14849**

Plaintiff filed offender complaint WCI-2008-14849 on May 27, 2008, complaining about the 24-hour lighting in segregation. Ms. Murphy investigated this complaint, which revealed that security lights in the segregation unit must remain on at all times so staff can visibly observe the inmates in their cells. The lights in the cells have been measured with a foot candle meter, and the reading was one foot-candle, which is the light given by a standard candle. The security lights dim, but inmates in control or observation status do not have control of the lights. The security lights must remain on at all times so staff can observe inmates to insure their safety, in case of medical emergency, and to prevent destruction of state property. Based on the information gathered in her investigation, Ms. Murphy recommended the complaint be dismissed.

**III. ANALYSIS**

**A. CONDITIONS OF CONFINEMENT**

To make out an Eighth Amendment claim based on prison conditions, an inmate must show he has suffered an objectively, sufficiently serious injury, and that prison officials inflicted the injury with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). An objectively, sufficiently serious injury is one that deprives the inmate "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Only extreme deprivations will support an Eighth Amendment claim. *Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir. 2001). Prison officials are deliberately indifferent to deprivations suffered by inmates if they have knowledge of the condition but refuse to take steps to correct it. *Dixon v. Godinez*, 114 F.3d 640, 645 (7th Cir. 1997).

**1. Foreign Objects in Food**

Plaintiff claims Officer Caul delivered him milk contaminated with bloody, snotty spit and that he once found metal in his ravioli. An inmate is entitled to a healthy environment including "'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.'" *French v. Owens,* 777 F.2d 1250, 1255 (7th Cir. 1985) (quoting *Ramos v. Lamm,* 639 F.2d 559, 571 (10th Cir. 1980)). That the food may occasionally contain foreign objects or is served cold, while unpleasant, does not amount to a constitutional deprivation. *See Lunsford v. Bennett,* 17 F.3d 1574, 1580 (7th Cir. 1994) ("complaints about cold and poorly-prepared food must" fail); *Hamm v. DeKalb County,* 774 F.2d 1567, 1575 (11th Cir. 1985); *see also Kennibrew v. Russell*, 578 F. Supp. 164, 168 (E.D. Tenn. 1983) (granting defendant summary judgment on plaintiff's claims of hair and bugs in his food and finding that "an occasional incident of a foreign object discovered in the prison food does not raise a constitutional question").

Officer Caul denies delivering plaintiff contaminated milk while plaintiff insists he did. Despite this factual dispute, the record does not support a finding that Officer Caul knowingly delivered plaintiff contaminated milk. Similarly, although plaintiff avers the milk caused him to contract mononucleosis, he has not shown this to be the case. Rather, it is undisputed the cause of plaintiff's mono is unknown. Plaintiff's conclusory averments do not raise a genuine issue of material fact or, for that matter, establish a constitutional violation. *See Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002) ("It is well-settled that conclusory allegations . . . without support in the record, do not create a triable issue of fact") (citing *Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719, 724 (7th Cir. 1998)).

## 2. Lighting

Plaintiff claims the lights in his segregation cell were brighter than what is constitutionally permitted. However, it is undisputed the lights in his cell measured one foot candle, which is equivalent to the light given by the standard candle. "[E]xtreme deprivations are required to make out a conditions-of-confinement claim," *Hudson v. McMillian*, 503 U.S. 1, 9 (1992), and 24-hour lighting involving a single, 9-watt fluorescent bulb does not objectively constitute an "extreme deprivation." *See Doe v. Welborn*, 110 F.3d 520, 524 (7th Cir. 1997). In *King v. Frank*, 371 F. Supp. 2d 977 (W.D. Wis. 2005), the court held a 9-watt fluorescent light to enable officials to observe the inmate at night, even burning 24 hours a day, was not bright enough to violate the inmate's rights. In this case, plaintiff's allegations do not constitute a sufficiently serious deprivation to implicate the Eighth Amendment.

## 3. Racial Slurs and Threats

Plaintiff claims Officers Beahm and Mueller made threatening and racial comments to him. Specifically, he claims Mueller made a racial slur against him, stating, "[I] don't like black guys, that's why." He also claims Beahm threatened to beat and kill him.

"The use of derogatory language, while unprofessional and deplorable, does not violate the Constitution." *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000). "Standing alone, simple verbal harassment does not constitute cruel and unusual punishment, deprive a prisoner of a protected liberty interest or deny a prisoner equal protection of the law." *Id.* Defendants deny threatening plaintiff or making a racial slur. However, even if they did, plaintiff's allegation do not implicate the Eighth Amendment. *See Dobbey v. Ill. Dep't of Corrs.*, 574 F.3d 443, 445-46 (7th Cir. 2009).

**4. Contaminated Water**

Plaintiff claims the running water in his cell was contaminated. In *Carroll v. DeTella,* 255 F.3d 470, 472 (7th Cir. 2001), the court explained that were the government "[p]oisoning the prison water supply" (which it was not in *Carroll*) then the government's conduct would be unconstitutional, but simply "failing to provide a maximally safe environment" for prisoners did not amount to a constitutional violation. *See also Helling v. McKinney,* 509 U.S. 25, 33-34 (1993) (suggesting inmates could successfully complain about unsafe drinking water without waiting for onset of symptoms). Moreover, in *Carroll,* the evidence at summary judgment did not establish the water supply violated EPA standards, and the court held that, as such, the water was not so polluted as to amount to a constitutional violation. *Id.* at 473.

In this case, it is undisputed plaintiff's concerns about water quality were addressed and found to be unsubstantiated. Once plaintiff expressed his concerns, an investigation was initiated revealing that around the time of the complaint, Engineering, Maintenance & Construction had been working on the pipes in segregation that may have caused extra sediment. Well water at WCI is hard, causing a build up of minerals in the system and discoloration. However, these conditions do not affect the quality of the water or cause any health hazards. To address his concerns, plaintiff was advised to run the water a bit longer to flush out any extra sediment. This inconvenience does not amount to a constitutional violation.

## B. MEDICAL CARE CLAIMS

A deliberate indifference claim requires both an objectively serious risk of harm and a subjectively culpable state of mind. *Edwards v. Snyder*, 478 F.3d 827, 830 (7th Cir. 2007); *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). A deliberate indifference claim based on inadequate medical treatment requires, to satisfy the objective element, a medical condition "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Edwards*, 478 F.3d at 830 (quoting *Greeno*, 414 F.3d at 653). The subjective component of a deliberate indifference claim requires the prison official knew of "a substantial risk of harm to the inmate and disregarded the risk." *Greeno*, 414 F.3d at 653 (citing *Farmer*, 511 U.S. at 834). Mere medical malpractice or a disagreement with a doctor's medical judgment is not deliberate indifference. *Edwards*, 478 F.3d at 830-31 (citing *Estelle v. Gamble*, 429 U.S. 97, 107 (1976); *Greeno*, 414 F.3d at 653; *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996)). Yet, a

18

plaintiff's receipt of some medical care does not automatically defeat a claim of deliberate indifference if a fact finder could infer the treatment was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" a medical condition. *Id.* (citing *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir.1996)).

For the purposes of summary judgment, defendants submit plaintiff's various conditions are serious medical needs. The court's analysis will therefore focus on whether defendants were deliberately indifferent.

## 1. Health Services: Nurse Gorske, Nurse Waltz, Nurse Schrubbe, & Dr. Sumnicht

Plaintiff claims Nurse Gorske inappropriately discontinued his prescription of Excedrin despite his history of migraines and she threatened to force feed him if he refused to eat his meals. He also claims Nurse Waltz was deliberately indifferent because she refused to treat him in observation status on March 24, 2008. Plaintiff further claims Nurse Schrubbe refused his request for a wheelchair and that he submitted several health service requests that went unanswered. Plaintiff claims Dr. Sumnicht was deliberately indifferent to his complaints of various ailments and he failed to provide treatment on March 24, 2008, but rather scheduled another appointment.

The undisputed facts reveal the following: Nurse Gorske ordered to hold plaintiff's Excedrin medication due to his complaints of vomiting blood because that medication contains aspirin which can cause ulcers and increase bleeding. On March 24, 2008, Nurse Waltz saw plaintiff, he complained his stomach hurt, and she noted he was to be seen by the WCI physician that day. Later that day, Dr. Sumnicht examined plaintiff and found his bowels were normal, his weight was appropriate, and the scratches on his skin were healing well, a sign of good health. Dr. Sumnicht ordered tests to evaluate

stomach pain, as well as medication to treat constipation and heartburn on a trial basis. A follow up visit for back pain evaluation was ordered. In addition, plaintiff's vital signs were found to be normal. In March and April 2008, plaintiff had been seen by HSU nursing staff fourteen times and he was evaluated by his primary care physician on March 4, 24, 26, 2008 and again on April 25, 2008. Based on Ms. Schrubbe's review of the progress notes and physician orders during this time period, none of the health care professionals who examined plaintiff indicated any objective medical reason he had difficulty walking or standing. Therefore, she determined a wheelchair was not medically necessary.

It is undisputed that between January and December 2008, plaintiff submitted more than 90 Health Service Request forms, and he received responses to each one of his requests. It is undisputed he was seen and treated by medical staff during that time, detailed in the Facts section, *supra.* The undisputed facts make clear plaintiff received prompt and adequate medical treatment. *See, e.g., Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006); *Gutierrez v. Peters*, 111 F.3d 1364,1374 (7th Cir. 1997). His medical care claims as to health services treatment therefore fail.


**2. Clinical Services: Dr. Froelich**

Plaintiff claims Dr. Froelich inappropriately discontinued his medication and failed to replace it with anything else, despite his complaints of pain. He also claims Dr. Froelich ignored his requests to be placed in a mental health facility on April 3, 2008. Serious medical needs are not restricted to physical conditions; the need for a mental illness to be treated may be considered a serious medical need if it could result in

20

significant injury, such as death by suicide, or the unnecessary and wanton infliction of pain. *Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001).

It is undisputed plaintiff was seen by Dr. Froelich for his mental health needs on a regular basis. While Dr. Froelich opined plaintiff was malingering somewhat, it is undisputed he prescribed different medications for plaintiff's symptoms. It is also undisputed he discontinued plaintiff's medications when plaintiff refused to speak with him about how the medication was affecting him, a necessary component of the treatment. Similar to plaintiff's medical treatment claims addressed above, the undisputed facts demonstrate plaintiff's mental health needs were addressed promptly and adequately by Dr. Froelich. As such, this claim also must fail.

### 3. Dental Services: Dr. John Schettle

Plaintiff claims after Dr. Schettle performed surgery on his teeth, he was in pain and Schettle placed him on a routine list and essential waiting list instead of the priority list. In *Berry v. Peterman*, 604 F.3d 435, 437 (7th Cir. 2010), a Wisconsin state prisoner, who was temporarily assigned to a county jail due to overcrowding, alleged a jail nurse, doctor, and administrator were deliberately indifferent to his tooth pain and decay. The prisoner had developed a serious toothache, and the nurse and doctor told him to take over-the-counter pain relievers, but refused to refer him to a dentist. *Id.* The prisoner experienced serious pain for about two months at which time he was returned to a state facility where he promptly saw a dentist who performed a root canal the same day. *Id.* The Seventh Circuit Court of Appeals affirmed the district court's granting of summary judgment to the jail administrator, but reversed as to the jail nurse and doctor, concluding a reasonable jury could infer the doctor and nurse acted with deliberate indifference toward

the inmate's condition by persisting in an easy but ineffective course of treatment that subjected him to two months of serious but unavoidable pain. *Id.* at 437-38. With respect to the doctor's conduct, the court reasoned, in part:

> On the summary judgment record, a jury could reasonably conclude that Dr. Butler knowingly adhered to an easier method to treat Berry's pain that she knew was not effective. She had not identified an effective pain medication, nor could she explain Berry's pain, yet she rejected the obvious alternative of referring Berry to a dentist. A jury could find that she simply concluded that Berry could endure his pain until his transfer back to the DOC several weeks later, when Berry would be the DOC dentist's problem, not hers. It is hard to imagine that a doctor seeing a civilian patient, or a doctor in a prison having on-site dental staff, would respond in this way to persistent complaints of severe dental pain over a period of weeks, even in the absence of a "dental emergency." A basic dental examination is not "an expensive or unconventional treatment," nor is it esoteric or experimental. *See Ralston*, 167 F.3d at 1162. Such examinations are inexpensive and commonly sought immediately to address severe dental pain. Thus, Dr. Butler's refusal to permit Berry such a basic treatment option could be characterized as a "gratuitous cruelty" forbidden by the Eighth Amendment. *See id.* Where Berry made a modest request for treatment by a dentist, Dr. Butler's "obdurate refusal to alter [Berry's] course of treatment despite his repeated reports that the medication was not working and his condition was getting worse", *see Greeno*, 414 F.3d at 654, is sufficient to defeat her motion for summary judgment.

*Id.* at 441-42 (footnote omitted).

In this case, the undisputed facts reveal plaintiff's dental needs were treated promptly, by a dentist. This case is distinguishable from *Berry* because in this case, plaintiff received treatment from a dentist on a consistent basis. Dr. Schettle performed dental surgery and checked on plaintiff twice after surgery, at which time he had no complaints. When plaintiff did subsequently complain, Dr. Schettle promptly readjusted the teeth.

Plaintiff claims the "readjustment" was actually a procedure to fix an error Dr. Schettle made during the original surgery. Even if Dr. Schettle did make a mistake during the original surgery, which is not proven, such claim would be one for negligence, not deliberate indifference. *See Estelle*, 429 U.S. at 106-07. Plaintiff also claims Dr. Schettle should have given him pain medication after the readjustment. However, he examined plaintiff and determined none was needed. Later, after plaintiff complained of pain, he was provided pain medication.

The undisputed facts reveal Dr. Schettle provided plaintiff continuous dental care and the only time his dental care was delayed was caused by plaintiff's refusal to receive treatment. Although plaintiff was dissatisfied with the dental care he received, no reasonable fact finder could conclude Dr. Schettle was deliberately indifferent to his dental needs. Now, therefore,

**IT IS ORDERED** that the plaintiff's motion for summary judgment (Docket #38) is **DENIED**.

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment (Docket #41) is **GRANTED**.

**IT IS FURTHER ORDERED** that the plaintiff's motion for summary judgment (Docket #67) is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiff's motion to appoint counsel (Docket #80) is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**.

Dated at Milwaukee, Wisconsin, this 30th day of September, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U.S. DISTRICT JUDGE